# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION AT COLUMBUS

ROBERT BETHEL,

                              :

                Petitioner,                         Case No. 2:10-cv-391

                              :            District Judge Michael R. Barrett

       -vs-                               Magistrate Judge Michael R. Merz

DAVID BOBBY, Warden,

                              :

               Respondent.

---

# SECOND SUPPLEMENTAL OPINION ON MOTIONS FOR DISCOVERY AND TO STAY

---

This habeas corpus case under 28 U.S.C. § 2254 is before the Court on Petitioner Robert Bethel's ("Petitioner" or "Bethel") Renewed Motion for Leave to Conduct Discovery, (Motion for Discovery, ECF No. 120), and Motion to Stay Federal Habeas Proceedings (Motion to Stay, ECF No. 125), both of which the Magistrate Judge has denied ("Decision," ECF No. 128). On Petitioner's Objections ("Objections," ECF No. 131), and the Warden's Response. (ECF No. 132), District Judge Barrett recommitted the matter for additional analysis (ECF No. 133), and the Magistrate Judge issued a Supplemental Opinion, recommending that Petitioner's Objections be overruled. (ECF No. 134). Petitioner filed Supplemental Objections (ECF No. 137), and Judge Barrett has again recommitted the matter to the Magistrate Judge (ECF No. 138). The Warden then filed a Response to the Supplemental Objections (ECF No. 139).

The relevant factual background and procedural history are recited in the Decision (ECF No. 128, PageID 8892-99) and in the Supplemental Opinion (ECF No. 134).

## STANDARD FOR REVIEW

When a Magistrate Judge rules on a nondispositive matter, "[a] party may serve and file objections. . . . The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed.R.Civ.P. 72(a). "The 'clearly erroneous' standard applies only to factual findings made by the Magistrate Judge, while h[is] legal conclusions will be reviewed under the more lenient 'contrary to law' standard." *Gandee v. Glaser*, 785 F. Supp. 684, 686 (S.D. Ohio 1992) (Kinneary, J.), citing *Fogel v. Chestnutt*, 668 F.2d 100, 116-17 (2nd Cir. 1981). The Court must accept a Magistrate Judge's findings of fact "unless they are clearly erroneous. A finding is clearly erroneous where it is against the weight of the evidence or where the court is of the definite and firm conviction that a mistake has been made." *Galbriath v. N. Telecom, Inc.*, 944 F.2d 275, 281 (6th Cir. 1991), overruled on other grounds by *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 352 (6th Cir. 1997). "A magistrate's [*sic*] judge's decision is contrary to law if the magistrate has 'misinterpreted or misapplied applicable law.' The contrary to law standard requires a district court to conduct an independent review of a magistrate judge's purely legal determinations." *Hood v. Midwest Sav. Bank*, No. C2-97-218, 2001 WL 327723, at *2 (S.D. Ohio Mar. 22, 2001) (Holschuh, J.), citing *FDIC v. Fidelity & Deposit Co. of Maryland*, 196 F.R.D. 375, 378 (S.D. Cal. 2000); *Pharm. Sales & Consulting Corp. v. J.W.S. Delavau Co., Inc.*, 106 F. Supp. 2d 761, 764 (D. N.J. 2000).

## ANALYSIS

While the Supplemental Opinion and Petitioner's Supplemental Objections addressed the Motion to Stay and Motion for Discovery separately, much of the Magistrate Judge's analysis and

Petitioner's arguments as to both motions concerns the issue of materiality under *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Thus, this Second Supplemental Opinion addresses the question of materiality as it pertains to both motions, and addresses the motions separately only where appropriate or necessary.

### A. Petitioner still cannot meet the materiality prong of *Brady*

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. For the purposes of the instant analysis, materiality is the only *Brady* element at issue. Evidence is immaterial under *Brady* if, even in its absence, a defendant received a fair trial, "understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 514 U.S. 419, 434 (1995). Materiality is "more than a mere 'possibility[,]' but less than proof 'by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal[,]'" and, thus, "'*Brady* materiality is not a sufficiency of the evidence test.'" (Supp. Objs., ECF No. 137, PageID 8989, quoting *Kyles*, 514 U.S. at 434; citing *Montgomery v. Bobby*, 654 F.3d 668, 679 (6th Cir. 2011)). Yet, "materiality[] in the *Brady* context is a difficult test to meet . . . if the defendant would still have been convicted based on evidence not affected by the suppressed material, the conviction must stand." *Jamison v.* Collins, 291 F.3d 380, 388 (6th Cir. 2002), citing *Strickler v. Greene*, 527 U.S. 263, 296 (1999).

In the Supplemental Opinion, the Magistrate Judge reiterated his conclusion from the original Decision that Petitioner's *Brady* claim was plainly meritless, finding that: Petitioner had failed to provide "any indication of what admissible evidence was reasonably likely to be

discovered had Summary 86 been produced[;]" and Donald Langbein ("Langbein"), the key witness against Petitioner at trial and the cousin of Jeremy Chavis ("Chavis"), who was tried and convicted of the same murders as Petitioner, was known to Petitioner as a suspect, having testified against Petitioner and been subjected to extensive cross-examination by Petitioner's trial counsel (ECF No. 134, PageID 8953, 8954). "Thus," the Magistrate Judge concluded, "even if Statement 86 had been disclosed to Petitioner's counsel and properly introduced under Rule 613, it still would not have created a reasonable probability of a different outcome, and thus, was not material." *Id.* at PageID 8954, citing *Kyles*, 514 U.S. at 434.

Petitioner again objects to the Magistrate Judge's finding as clearly erroneous and contrary to law (Supp. Objs., ECF No. 137, PageID 8973-74). He reiterates that the subject of his Motion and Objections are the undisclosed Columbus, Ohio, Police Department ("Columbus PD") Report ("Summary 86"), in which a Ronald Withers ("Withers") recounted statements made to him by Chavis, and several undisclosed prison telephone recordings between Chavis and Langbein. He argues that "[t]he cumulative effect of the two corroborating undisclosed reports and multiple recordings would have given defense counsel unique ability to discredit the State's primary witness, highlight the shoddiness of the State's investigation, and most significantly, point to another perpetrator." *Id.*, citing *Kyles*, 514 U.S. at 445.

### 1. Incrimination of Langbein as Perpetrator

Petitioner claims that the statements contained in Summary 86 and the recordings implicate Langbein as Chavis's co-perpetrator. Petitioner argues, had the State not suppressed the relevant information:

> [C]ounsel would have had more avenues to pursue the theory that Langbein was the second shooter. A unanimous Supreme Court has stressed the importance of a defendant's constitutional right to argue reasonable doubt through alternative suspects: "Just because the prosecution's evidence, *if credited,* would provide strong support for a guilty verdict, it does not follow that evidence of third-party guilt has only a weak logical connection to the central issues in the case."

(Objs., ECF No. 137, PageID 8977 (emphasis in original), quoting *Holmes v. South Carolina* 547 U.S. 319, 330 (2006)). Petitioner claims that, had his counsel been able to present evidence of Langbein's involvement in the murder, "[a] juror could have determined that Bethel's proffer, for example, was unreliable in light of the suppressed evidence." In light of the potential for the suppressed evidence to undermine the most damning evidence against Bethel—the proffer—"[i]t is difficult to understand how this favorable suppressed evidence could be considered immaterial, even if it is 'hearsay.'" (Objs., ECF No. 137, PageID 8977-78, citing *Cone v. Bell*, 556 U.S. 449, 475 (2009)).

In his Objections to the Motion for Discovery, Petitioner claims that the Magistrate Judge's holding that Petitioner "'does not argue, for example, that the disclosure of Summary 86 would have caused his attorneys to advise him against accepting the plea agreement and making the proffer' . . . is clearly erroneous." (Supp. Objs., ECF No. 137, PageID 8993, quoting Supp. Opinion, ECF No. 134, PageID 8959). He argues that he would not have agreed to plead guilty, and make the proffer, had Summary 86 and the Ozbolt Report[1] been disclosed to his counsel prior to trial. *Id*. at PageID 8993-94, citing Janes Aff., ECF No. 124-1, PageID 8807-08; McVay Aff., ECF No. 124-1, PageID 8812. Petitioner argues that, notwithstanding Langbein's being known to his trial attorneys and considered the perpetrator by them, the suppressed evidence was so

---

[1] Also known as "Summary 85," the Ozbolt Report is *Brady* material that was the subject of previous motion practice before this Court. See *infra* and ECF Nos. 88, 96, 100, 106, 111, and 118 for further discussion.

favorable to him that, had it been disclosed, his attorneys would have advised him against taking the plea bargain offered and making the proffer in the first instance. *Id*. at PageID 8978, citing Aff. of Ronald Janes, ECF No. 124-2, PageID 8849-50, ¶¶ 12-13. Petitioner claims that because both Summary 86 and the recordings support his theory that it was actually Langbein who committed the murders, there must be an opportunity for the state court to consider the *Brady* evidence *in toto*, which has never happened. *Id*. at PageID 8983-84, citing Am. Petition, ECF No. 48, PageID 650-53; *Mandacina v. United States*, 328 F.3d 995, 1000 (8th Cir. 2003).

Petitioner did not, in his Motion for Discovery, reply in support thereof, or initial Objections, cite these portions of the affidavits or raise such an argument. While Petitioner states that he cited the Janes Affidavit in the Motion to Stay, *id*. at PageID 8993, he does not provide a record citation, much less explain how the Court was to know that Petitioner intended for the Court to consider that portion of the Janes Affidavit in conjunction with his Motion for Discovery, which was already fully briefed before the Motion to Stay was even filed. Nonetheless, the Court will consider Petitioner's argument that "[t]he State's failure to provide favorable evidence, in accordance with its duty, 'misleadingly induced defense counsel' to rely on one strategy when they might have otherwise chosen another." *Id*. at PageID 8994, quoting *United States v. Bagley*, 473 U.S. 667, 683 (1985).

In *Bagley*, the Supreme Court held that insufficient disclosure of *Brady* material caused "defense counsel to believe that [the Government's witnesses] could not be impeached on the basis of bias or interest arising from inducements offered by the Government." *Bagley*, 473 U.S. at 683. In this case, however, Petitioner's counsel was well aware of the fact that Langbein had cooperated with the State and attempted to impeach him on that basis (*See, e.g.*, Trial Trans., ECF No. 56-15, PageID 7407-08 (Prosecutor's closing argument, in which he states that Petitioner's counsel has

attempted to portray Langbein, rather than Petitioner, as the murderer)). Even granting, however, that the State's failure to disclose "the requested *Brady* information that respondent could have used to conduct an effective cross-examination impaired respondent's right to confront adverse witnesses[,]" *Bagley*, 473 U.S. at 674, Petitioner is still left with attempting to argue that he actually did not commit the murders, despite both Theresa Cobb Campbell ("Campbell"), Petitioner's ex-girlfriend, and Langbein testifying that he confessed the murders to them (Trial Trans., ECF No. 56-12, PageID 6718-19 (Langbein), 6833 (Campbell)). In other words, the proffer was not the only statement presented to the jury in which Petitioner admitted that he committed the murders. Even if trial counsel were successful in using the Ozbolt Report and Summary 86 to impeach Langbein, and to support their theory—already introduced to the jury— that it was Langbein, rather than Petitioner, who committed the murders, there was still Petitioner's confession to Campbell.

Finally, Petitioner argues that:

Even before factoring in the *Brady* evidence, this case lacks the hallmarks of overwhelming evidence. There is no forensic evidence or DNA directly implicating Bethel. No eye-witnesses testified. The murder weapons were never found. . . . Moreover, Bethel was not arrested for more than four years after Hawks' and Reynold's [*sic*] deaths. The prosecutors only decided that there was sufficient evidence against Bethel in July 2000 when Langbein, who had just been arrested on federal weapons charges, sought favor with the State by providing information about the Reynolds and Hawk murders. If Langbein's testimony were not the lynchpin of the State's case, it has yet to explain why it waited to arrest Bethel until Langbein came forward.

(Supp. Objs., ECF No. 137, PageID 8995-96). Yet, it is undisputed that all the evidence and arguments raised by Petitioner in the preceding quotation were known and available to his counsel prior to trial, and indeed, trial counsel attempted to impeach Langbein and portray him as the perpetrator with the evidence and arguments. The jury presumably considered the evidence and rejected Petitioner's arguments. As it is not the place of this habeas corpus Court to act as some

sort of "super jury" and review *de novo* the verdict and findings of the trial jury, Petitioner's Objection is not well taken.

## 2.     Impeachment of Langbein and Deficiencies in Investigation

Petitioner further claims that the "Magistrate Judge noted but did not address Bethel's argument that the evidence could have been used to impeach Langbein, a purpose for which extrinsic evidence is allowed." (Supp. Objs., ECF No. 137, PageID 8975, citing Supp. Opinion, ECF No. 134, PageID 8952). As the United States Court of Appeals for the Sixth Circuit has held that impeachment evidence comes within the scope of *Brady* material, Petitioner argues that any finding that his *Brady* claim was meritless based on the material's being hearsay, *i.e.*, inadmissible for the truths of the matters asserted, was clearly erroneous. *Id.*, citing *Robinson v. Mills*, 592 F.3d 730, 735 (6th Cir. 2010)).[2] Further, "the fact that [Petitioner's] trial counsel attempted and failed to impeach Langbein's credibility on cross-examination supports a finding that the suppressed evidence is material[.]" *Id.* at PageID 8979-80, citing *Wearry v. Cain*, 136 S.Ct. 1002, 1007-08 (2016); *Smith v. Cain*, 565 U.S. 73, 76 (2012); *Banks v. Dretke*, 540 U.S. 668, 702 (2004); *Robinson*, 592 F.3d at 736-37. Additionally, Petitioner claims that the suppressed materials could have been used in the cross-examinations of Columbus PD Detective Ed Kallay and federal Bureau of Alcohol, Tobacco, and Firearms ("ATF") Special Agents Daniel F. Ozbolt and Tim Burt, "to challenge . . . their paltry investigation of Langbein as a second shooter, despite their creating

---

[2] In the Supplemental Opinion, the Magistrate Judge noted, in the context of Chavis's appeal, the prosecutor at Chavis's trial "explained that he believed that Chavis's trial testimony was untruthful because it was inconsistent with statements Chavis had made to the police in November 2000." (ECF No. 134, PageID 8954, quoting *State v. Chavis*, 10th Dist. Franklin Nos. 01AP-1456, 01AP-1466, 2003-Ohio-512, ¶ 40 (Feb. 4, 2003)). Petitioner notes, correctly, that the prosecutor's statement was in reference to Chavis's brother, Cheveldes, and not Chavis himself. (Supp. Objs., ECF No. 137, PageID 8974). This discrepancy, however, has no effect on the Magistrate Judge's findings and conclusions in the Supplemental Opinion.

multiple reports of his involvement." *Id.* at PageID 8975-76, citing Aff. of Kirk A. McVay, ECF No. 124-2, PageID 8854, ¶ 12; *Kyles*, 514 U.S. at 441-42, 445, 447 n.13; *Bies v. Sheldon*, 775 F.3d 386, 401 (6th Cir. 2014).

The Magistrate Judge has already explained why *Bies* is inapposite (Supp. Opinion, ECF No. 134, PageID 8953-54), and incorporates that discussion by reference. In *Kyles*, Supreme Court emphasized that, had statements made by the prosecution's principal witnesses been disclosed, it "would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense. To begin with, the value of two of those witnesses would have been substantially reduced or destroyed." 514 U.S. at 441. The Court reiterated that "the effective impeachment of one eyewitness can call for a new trial[,]" *id.* at 445, citing *United States v. Agurs*, 427 U.S. 97, 112-13 n.21 (1976), and that the withholding of *Brady* material prevented defendant's attorneys from examining the law enforcement officers and "attack[ing] the reliability of the investigation in failing even to consider [the eyewitness's] possible guilt." *Id.* at 446, and in doing so, also created an unfair trial. *Id.* at 446-47.

Petitioner is correct that the mere fact that Langbein was known to the defense does not mean that the State had the option to withhold evidence in support of that theory; nor does it render the State's withholding of Summary 86 harmless (Objs., ECF No. 137, PageID 8979, citing Supp. Opinion, ECF No. 134, PageID 8953-55; *Kyles*, 514 U.S. at 445-47; *Jells v. Mitchell,* 538 F.3d 478, 506-07 (6th Cir. 2008), writ denied, No. 1:98 CV 02453, 2011 WL 1257306 (N.D. Ohio Mar. 31, 2011)). Yet, there remain differences in degree between the circumstances of Petitioner vis-à-vis the petitioner in *Kyles*. In the latter, there was a history of enmity between Kyles and "Beanie," the informant who provided substantial evidence against Kyles, which long predated the murder and Kyles's indictment for that murder. 514 U.S. at 425. Petitioner cites to no evidence of record

suggesting such a history of enmity between Langbein and himself.  Further, Petitioner admits that law enforcement at least created "multiple reports" regarding Langbein as a possible perpetrator; without more, it cannot be reasonably said that ATF and Columbus PD "fail[ed] even to consider [Langbein's] possible guilt."  Importantly, Beanie did not testify at either of Kyles's trials, *id.* at 429-30, meaning that Kyles's trial counsel never had the opportunity to cross-examine Beanie and attempt to undercut his credibility.  Petitioner's trial counsel, on the other hand, vigorously cross-examined Langbein, to the extent that "during closing argument, the prosecutor chided Bethel's defense team, saying that the attempt to 'now blame it on Donny [Langbein], with zero, zero evidence, is pretty convenient.'"  (Supp. Objs., ECF No. 137, PageID 8981 (alterations in original), quoting Trial Trans., ECF No. 56-15, PageID 7407-08).[3]

Moreover, as discussed before, the statements in Summary 86 and the phone calls contain multiple layers of hearsay.  Thus, there is a strong possibility that they may not have been admitted, and in turn, not considered by the jury, for the truth of the matters asserted therein, OHIO R. EVID. 801-02, which would have sharply limited their probative value.  The Magistrate Judge agrees that the statements contained in Summary 86 and the phone calls, if admissible, would have provided a significant additional basis for impeaching and undermining the credibility of Langbein, the State's key witness against Chavis and Petitioner. Yet, contrary to Petitioner's argument, the Magistrate Judge is not convinced that these materials provide the "corroborating circumstances" indicating the trustworthiness of the Ozbolt Report, which this Court previously found lacking.

---

[3] Petitioner does not dispute the State's characterization that his trial counsel attempted to persuade the jury that it was Langbein, rather than Petitioner, who committed the murder along with Chavis.  This renders unavailing his objection that "the Magistrate Judge's finding that Langbein was known 'as a suspect' is clearly erroneous."  (Supp. Objs., ECF No. 137, PageID 8980).  Petitioner argues that "[t]he citation supporting that finding actually identified Langbein as an informant, not as a suspect."  (Objs., ECF No. 137, PageID 8980-81, quoting *Chavis*, 2003-Ohio-512, ¶ 42) (noting that "the testimony offered by Langbein . . . established that defendant admitted to committing the crimes charged in the indictment[.]").  That cited language does not identify Langbein as an informant.  Moreover, regardless of whether Langbein was considered a suspect by *law enforcement*, he was considered a suspect by *Petitioner and his counsel*, which was the gravamen of the Magistrate Judge's finding.

(Supp. Objs., ECF No. 137, PageID 8988, citing *Bies*, 775 F.3d at 400 n.9; *Gumm v. Mitchell*, 775

F.3d 345, 369 (6th Cir. 2014); *see also* Opinion & Order, ECF No. 118, PageID 8726).

### 3. The *Brady* evidence was evaluated cumulatively, not in isolation, and supports the conclusion that the evidence was immaterial

Petitioner argues that "the Magistrate Judge acknowledged that 'the materiality of

suppressed evidence must be measured by the cumulative effect that evidence has on the validity

of the jury's verdict.' However, no such analysis was ever undertaken." (Objs., ECF No. 137,

PageID 8986, quoting Supp. Opinion, ECF No. 134, PageID 8962-63). He claims that the failure

to evaluate Summary 86 and other suppressed *Brady* evidence cumulatively meant that the

undersigned "egregiously misapplied settled [Supreme Court] law." *Id*. (alterations in original),

quoting *Wearry v. Cain*, 136 S.Ct. 1002, 1007 (2017).

Petitioner claims any reliance by the Magistrate Judge on the Supreme Court of Ohio

decision in *Bethel* was misguided, because "[a]t the time that opinion was written, the Ohio

Supreme Court was unaware that the prosecutors suppressed favorable evidence that Chavis and

Langbein, not Bethel, were the shooters[,]"and "[b]ecause the State withheld evidence, its case

was much stronger, and the defense case much weaker, than the full facts would have suggested."

(Supp. Objs., ECF No. 137, PageID 8989-90, quoting *Kyles*, 514 U.S. at 429 (internal quotation

marks omitted)). Further, Petitioner notes, the Supreme Court of Ohio was addressing Petitioner's

assignment of error that the conviction was against the manifest weight of evidence, and evaluated

that assignment under a "sufficiency of the evidence" standard; as evaluation under a sufficiency

of the evidence standard *in the Brady context* is grounds for reversal, "[t]o the extent that discovery

was denied because there was sufficient evidence to support Bethel's conviction, the Magistrate

Judge mischaracterized the materiality inquiry under *Brady*." *Id.* at PageID 8990, citing *Kyles*, 514

U.S. at 434; Supp. Opinion, ECF No. 134, PageID 8963; *Bethel*, 2006-Ohio-4853, at ¶¶ 100, 111. The proper evaluation standard is particularly important, Petitioner claims, as the Ozbolt Report and Summary 86 amplified Langbein's status as a suspect and were "impeachment evidence 'directly applicable to the most damaging testimony[.]'" *Id*. at PageID 8991, quoting *Jamison v. Collins*, 291 F.3d 380, 385, 389-91 (6th Cir. 2002). *Jamison* is instructive, Petitioner argues, because "[a]s noted by the Supreme Court of Ohio, Langbein's testimony was part of the 'key evidence supporting Bethel's conviction.'" *Id*. at PageID 8992, quoting *Bethel*, 2006-Ohio-4853, at ¶ 101. Thus, "[l]ike *Jamison*, the suppressed evidence at issue with Bethel does not conclusively prove innocence. But under *Brady's* materiality analysis, it does not have to. The key point is, like *Jamison*, Bethel was unable to impeach the key witness against him because the ATF Report and Summary 86 were suppressed." *Id*.

The Warden notes that the Petitioner's "recent objections largely ignore" (ECF No. 139, PageID 9004) the undersigned's reliance upon the standard set forth in *Harris v. Nelson*: whether there is "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief." (Supp. Opinion, ECF No. 134, PageID 8960, quoting 394 U.S. 286, 300 (1969)). Petitioner makes only passing reference to *Harris*, stating that he "relies on his previous objections in regards to the Magistrate Judge's reliance on *Harris* . . . . Regardless of whether this Court relies on Habeas Rule 6 or *Harris*, Bethel still meets the standard necessary to obtain discovery." (Supp. Objs., ECF No. 137, PageID 8986 n.5, citing Objs., ECF No. 131, PageID 8937-40). As "Habeas Corpus Rule 6 is meant to be consistent with *Harris*[,]" *Bracy v. Gramley*, 520 U.S. 899, 909 (1997) (internal quotation marks and citation omitted), Petitioner's continued citation in the disjunctive is improper.

Further, Petitioner mischaracterizes the undersigned's analysis. The Magistrate Judge is mindful of the Supreme Court's requirement that the materiality of suppressed *Brady* evidence "must be measured by the cumulative effect that evidence has on the validity of the jury's verdict." (Supp. Opinion, ECF No. 134, PageID 8962-63 (emphasis removed) (citation omitted)). Rather, the Magistrate Judge properly evaluated these materials against the significant inconsistencies between the previously identified *Brady* evidence (e.g., the Ozbolt Report) and the other evidence introduced against Petitioner at trial (*See*, *e.g.*, Opinion & Order, ECF No. 118, PageID 8721-22, quoting *Eakes v. Sexton*, No. 14-5017, 592 F. App'x 422, 427-28 (6th Cir. 2014)) (rejecting similar argument with respect to the Ozbolt Report, noting that "as the Sixth Circuit has explained: The materiality of *Brady* evidence depends almost entirely on the value of the undisclosed relative to the other evidence produced by the state.").

The evidence is different in this case. Whereas the *Brady* evidence in *Jamison* concerned the impeachment of a non-suspect eyewitness (albeit one who claimed to be the victim of a battery by the defendant that was ancillary to the robbery and murder for which the defendant was convicted), the Ozbolt Report and Summary 86 would have been used to further impeach Langbein, whom Petitioner's trial attorneys had already attempted to portray as the perpetrator. Further, in *Jamison*, "the only primary piece of evidence uncontradicted by the *Brady* documents" was the print of a Pony-brand shoe, which "is, alone, insufficient to produce a conviction-although Jamison was apprehended for the Gold Star Chili robbery wearing Pony shoes, these were not identical to the print found at the Central Bar scene. As the defense noted, many similar pairs of shoes had been sold in the relevant geographical area." *Id.* at 391. In this case, while there was no forensic evidence linking Petitioner to the murders, there was, as Petitioner concedes, "an

unprovable alibi" and the testimony of Campbell that Petitioner confessed the murders to her (Supp. Objs., ECF No. 137, PageID 8994, 8995).

Petitioner argues that "not only did [Campbell's] version of Bethel's 'confession' differ significantly from Langbein's, but her credibility was shaky at best." (Supp., Objs., ECF No. 137, PageID 8995). In support, he cites portions of the trial transcript in which, on cross-examination, Campbell:

> [A]dmitted that she has always had emotional problems, had previously had a stay in a mental health facility, is "bipolar," and "[has] posttraumatic [sic] stress disorder,…stress disorder and anxiety." A television fell on her head when she was three years old. She was beaten and stabbed in the head when she was 18 years old. And at the time of her testimony, she was on "Paxil, Depakote, and Demerol," which had side effects including hallucinations and memory loss.

*Id.* (alterations in original), quoting Trial Trans., ECF No. 56-12, PageID 6835, 6837-40. The Court notes that up to this point, Petitioner "ha[d] failed to point to any evidence" of Campbell's having testified regarding her history mental illness, "and it is not the Court's function to scour the record in search of such evidence." *Leiper v. Sloter Concrete*, No. 2:05-cv-464, 2006 WL 2035658, at *3 (S.D. Ohio Jul. 18, 2006) (Frost, J.), citing *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).[4] Further, and more importantly, the jury was made aware of Campbell's history of mental illness and memory issues, and her status as Petitioner's ex-girlfriend, and nonetheless convicted Petitioner. It is not the job of this habeas Court to guess at how much of the jury's decision was based on Campbell's testimony and the alibi versus

---

[4] The Court is cognizant that the statements in *Leiper* and *InterRoyal* were made in the context of motions for summary judgment. Yet, the statements are no less relevant with respect to a Motion to Stay or Motion for Discovery.

Langbein's testimony or the proffer[5]; rather, the question is whether there exists enough unaffected evidence inculpating Petitioner to support the conviction and death sentence. *Strickler*, 527 U.S. at 296.

Such evidence exists. In addition to the evidence discussed above, this Court's previous analysis is worth reproducing in full in light of Petitioner's objections:

> As the Franklin County Court of Appeals explained, there was other evidence in the record which undermined the reliability of the Ozbolt report: "it is wholly speculative as to whether Langbein's statements are referring to the homicides at issue here. Williams said Langbein stated he was involved in a homicide where the victim was shot 17 times. Here, there were two-victims; one shot ten times, and the other shot four times. Also, Williams said Langbein stated the other person who was arrested was the driver after the homicide; however, according to appellant, Chavis was not a driver but an actual participant in the shootings. Appellant's version of events, that he used a 9mm while Chavis used a shotgun, correlates with the evidence presented at trial that the victims suffered wounds consistent with those caused by a 9mm and a shotgun. Additionally, multiple 9mm shell casings and 12-guage shotgun casings were recovered from the scene."

(Opinion & Order, ECF No. 118, PageID 8726, quoting *State v. Bethel*, 10th Dist. Franklin No. 09AP-924, 2010-Ohio-3837, ¶ 21 (Aug. 17, 2010)).

Petitioner notes that the statements by Langbein to Shannon "Puff" Williams, and relayed by Puff to state and federal law enforcement in the Ozbolt Report, identified Langbein and Chavis, rather than Bethel and Chavis, as the murderers; he argues that Judge Barrett's only reason for concluding that the Ozbolt Report was not material was that it lacked "the 'corroborating

---

[5] In separating out the proffer, the Magistrate Judge is accepting as true the representations of Petitioner's trial counsel that, had they been aware of the Ozbolt Report and Summary 86, they would have advised him not to accept the plea bargain and take the proffer.

15

circumstances' which would indicate the trustworthiness of the statement" relayed by Puff in the Ozbolt Report. *Id*. at PageID 8987, quoting Opinion & Order, ECF No. 118, PageID 8726.

> We now know that in another undisclosed police report, Ronald Withers told Columbus Police Detective Ed Kallay and ATF Agents Ozbolt and Burt that "Chavis told Withers that his cousin was the other shooter, and his cousin is also incarcerated." Chavis's cousin is Donald Langbein. Ronald Withers provided an affidavit to Bethel's counsel confirming that he relayed this information to detectives from the Columbus Police Department in 2001.

*Id*., citing Summary 86, ECF No. 95-9, PageID 8532-34. Summary 86, he argues, is the corroborating information that Judge Barrett concluded was lacking. *Id*. at PageID 8988, citing *Bies*, 775 F.3d at 400 n.9; *Gumm*, 775 F.3d at 369; *State v. Landrum*, 53 Ohio St. 3d 107, 114 (1990). Further, Langbein had "already testified at trial that he was part of a plan to kill another man cooperating with the police . . . , similar to the victims in this case[,]" *id*., citing Trial Trans., ECF No. 56-12, PageID 6823-24, and "[t]he reports are further bolstered [by] a series of recordings in which, among other statements, 'Chavis told an unidentified female that he had "taken the rap" for Langbein with respect to the murders.'" *Id*., quoting Decision & Order, ECF No. 128, PageID 8897. Petitioner claims that the cumulative nature of this evidence, at the very least, raises the reasonable probability of a different outcome, and thus, the Magistrate Judge's materiality analysis was contrary to law. *Id*. at PageID 8988-89.

Summary 86, reciting Kallay, Ozbolt, and Burt's interview with Ronald Withers, relayed Chavis's statements to Withers that "when he shot the individual he was already dead, and that ballistics will show that his bullet was not the fatal shot. . . . Chavis told Withers that his cousin was the other shooter, and that this cousin was incarcerated." (ECF No. 95-9, PageID 8533, ¶ 3). In a light most favorable to the Petitioner, Chavis's statement that his "cousin was the other shooter," *id*., could corroborate the statement in the Ozbolt Report in which Langbein told Shannon

Puff that he had committed a homicide along with an individual incarcerated at the Federal Correctional Institution in Ashland, Kentucky ("FCI-Ashland"), as it is undisputed that Chavis was incarcerated at FCI-Ashland at the time Langbein allegedly made that statement to Puff. *Bethel*, 2010-Ohio-3837, at ¶ 10. However, Summary 86 otherwise does nothing to resolve the factual inconsistencies between the Ozbolt Report and the evidence summarized by the Tenth District, such that this Court should override the AEDPA deference it had properly accorded the state court determination that the Ozbolt Report was not *Brady* material (Decision and Order, ECF No. 69, PageID 8303). Nor does it provide a compelling argument why this Court should credit Chavis's statements and the Ozbolt Report over the evidence credited by the state court. Accordingly, the Magistrate Judge concludes that Summary 86 and the recordings do not provide "the 'corroborating circumstances that indicate the trustworthiness of the statement in which Langbein admitted to the murders." (Opinion & Order, ECF No. 118, PageID 8726.)

Further, a lack of corroborating circumstances was not the only reason to deny the requested relief. In *Bagley*, the Supreme Court held that insufficient disclosure of *Brady* material caused "defense counsel to believe that [the Government's witnesses] could not be impeached on the basis of bias or interest arising from inducements offered by the Government." *Bagley*, 473 U.S. at 683. In this case, however, Petitioner's counsel was well aware of the fact that Langbein had cooperated with the State and attempted to impeach him on that basis (*See, e.g.*, Trial Trans., ECF No. 56-15, PageID 7407-08 (Prosecutor's closing argument, in which he states that Petitioner's counsel has attempted to portray Langbein, rather than Petitioner, as the murderer)). Even granting, however, that the State's failure to disclose "the requested *Brady* information that respondent could have used to conduct an effective cross-examination impaired respondent's right to confront adverse witnesses[,]" *Bagley*, 473 U.S. at 674, Petitioner is still left — as discussed

above— with both Campbell and Langbein testifying that he confessed the murders to them. Even if trial counsel were successful in using the Ozbolt Report and Summary 86 to impeach Langbein, and to support their theory—already introduced to the jury—that it was Langbein, rather than Petitioner, who committed the murders, there was still Petitioner's confession to Campbell and, in Petitioner's own words, an "unprovable alibi."

Finally, Petitioner argues that:

> Even before factoring in the *Brady* evidence, this case lacks the hallmarks of overwhelming evidence. There is no forensic evidence or DNA directly implicating Bethel. No eye-witnesses testified. The murder weapons were never found. . . . Moreover, Bethel was not arrested for more than four years after Hawks' and Reynold's [*sic*] deaths. The prosecutors only decided that there was sufficient evidence against Bethel in July 2000 when Langbein, who had just been arrested on federal weapons charges, sought favor with the State by providing information about the Reynolds and Hawk murders. If Langbein's testimony were not the lynchpin of the State's case, it has yet to explain why it waited to arrest Bethel until Langbein came forward.

(Supp. Objs., ECF No. 137, PageID 8995-96). Yet, it is undisputed that all the evidence and arguments raised by Petitioner in the preceding quotation were known and available to his counsel prior to trial, and indeed, trial counsel attempted to impeach Langbein and portray him as the perpetrator with the evidence and arguments. The jury presumably considered the evidence and rejected Petitioner's arguments. In sum, while the Ozbolt Report and Summary 86 reinforce the evidence and arguments presented, they do not provide the Court with "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief." *Harris*, 394 U.S. at 300. For these reasons, Petitioner's Objections should be overruled.

**B.      Petitioner still has not demonstrated that the Motion to Stay is timely**

In the Supplemental Opinion, the Magistrate Judge concluded that "even assuming that the discovery of Summary 86 constitutes a new *Brady* claim, Petitioner has not shown why his Motion to Stay complies with the one-year statute of limitations" of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA") (ECF No. 134, PageID 8955, citing 28 U.S.C. § 2244(d)(1)).  The Magistrate Judge concluded that:  Petitioner's failure to show how the claim was timely, despite multiple opportunities to do so; failure to show good cause for any delay; and the AEDPA's encouragement of finality, would have made granting the Motion to Stay improper.  *Id*. at PageID 8956, citing *Rhines v. Weber*, 544 U.S. 269, 277 (2005).

In his Objections, Petitioner states that he "never argued that he needed to comply with a one year statute of limitations.  To the contrary, Bethel has stated for over a year that any amendment will relate back to his Fifteenth Ground for Relief."  (Objs., ECF No. 137, PageID 8981-82, citing Notice of Intent to Amend, ECF No. 95, PageID 8517; Reply, ECF No. 123, PageID 8776).  He argues that there is a common core of facts between the *Brady* claim pled in his Amended Petition and the newly-discovered evidence (Ozbolt Report, Summary 86, recordings).  Thus, the new evidence merely "clarifies and amplifies a claim or theory" in the original petition, and falls under "relation-back" doctrine, meaning that the statute of limitations is not implicated.  *Id*. at PageID 8982, quoting *Woodward v. Williams*, 263 F.3d 1135, 1142 (10th Cir. 2001); citing Fed.R.Civ.P. 15(c)(1)(B); *Mayle v. Felix*, 545 U.S. 644, 664 n.7 (2005); *Cowan v. Stovall*, 645 F.3d 815, 819 (6th Cir. 2011); *Mandacina*, 328 F.3d at 1001.

Further, Petitioner argues that even if there was a delay between discovering Summary 86 and the tapes and filing the Motions to Amend and Stay, delay is not itself sufficient to deny those motions; "[n]otice and substantial prejudice to the opposing party are critical factors in determining

whether an amendment should be granted." (Supp. Objs., ECF No. 137, PageID 8985, citing *Coe v. Bell*, 161 F.3d 320, 341-42 (6th Cir. 1998); *Brooks v. Celeste*, 39 F.3d 125, 130 (6th Cir. 1994)). Petitioner claims that these equitable considerations weigh in favor of granting the motions: "There is no assertion of prejudice to the State in this case, particularly since the materials at issue were in its possession. Rather, it is Bethel—facing execution—who has been prejudiced by the State's suppression of exculpatory evidence." *Id*. at PageID 8984. "In addition," Petitioner argues that he "sought to minimize any potential delay by filing his motion for leave in state court and requesting a hearing well before his motion to stay, let alone before any stay decision by this Court." *Id*. at PageID 8985, citing Notice of State Court Litigation, ECF No. 124, PageID 8779.

As the Warden notes, while Petitioner argues that any new evidence, including Summary 86, relates back to his previous *Brady* claim, he also "somewhat simultaneously and incongruously argues that Summary 86 considered 'cumulatively' with other alleged suppressed evidence 'will essentially create a new *Brady* claim.'" (Resp., ECF No. 139, PageID 9003, quoting Supp. Objs., ECF No. 137, PageID 8981 n.3). Indeed, Petitioner quotes the footnote in *Cullen v. Pinholster* in which the majority acknowledges that "Justice Sotomayor's hypothetical involving new evidence of withheld exculpatory witness statements . . . may well present a new claim[,]" 563 U.S. 170, 186 n.10 (2011), yet also argues that "there is little disagreement that Bethel's new evidence relates back to an existing claim." (Supp. Objs., ECF No. 137, PageID 8984).

Moreover, "[i]n his latest objections, Bethel *still* does not state when he discovered Summary 86." (Resp., ECF No. 139, PageID 9003 (emphasis in original)). Thus, even if the relation-back doctrine were to apply, the undersigned's concern remains as to whether Petitioner's motions are untimely, and thus, contravene the AEDPA's preference for finality. Petitioner has done little, if anything, to assuage that concern. Indeed, while Petitioner was diligent throughout

2017 in attempting to obtain the recordings of telephone calls between Chavis and Langbein (Notices of Intent to Amend, ECF Nos. 105, 109, 110), Summary 86 came into his possession no later than April 11, 2017, the date on which it was filed as an exhibit to Petitioner's First Notice of Intention to Amend (ECF Nos. 95, 95-9). That First Notice was filed more than one month prior to Petitioner filing his Objections to the Magistrate Judge's Order Denying his Motion for Evidentiary Hearing (ECF No. 100).

A portion of Petitioner's Objections to the Magistrate Judge's Order denying Evidentiary Hearing centered on the Magistrate Judge's supposedly erroneous conclusion that the Ozbolt Report was not material. Specifically, Petitioner argues that had his attorneys been in possession of that report, "they could have refuted the State's assertion that Langbein's knowledge of the crime was proof that Bethel confessed to him his involvement in the murders." (ECF No. 100, PageID 8597). Petitioner argues that "Langbein was the source for much of the incriminating information against Bethel[,]" *id*. at PageID 8600, and quotes a portion of the state court record in support:

> Langbein told police, on July 7, 2000, that Bethel and Jeremy Chavis "killed two people in the south end." He described how the motive was to "take care of" the fact that Reynolds was to be a witness against Tyrone Green. He claimed that Chavis took him to the "body of water" into which he had discarded the weapons, but "he was unable to give [police] detailed directions on how to get there." As the Supreme Court of Ohio later put it, "[t]he key evidence supporting Bethel's conviction was his own statements to Langbein and Campbell and his proffer of August 30, 2001."

*Id*., quoting Return of Writ App'x, ECF No. 54-9, PageID 3017, 3018; citing *Bethel*, 2006-Ohio-4853, at ¶ 101. Elsewhere, he argues that "even if Langbein somehow *were* referring to a separate homicide" in the Ozbolt Report, "the statement still should have been turned over. Langbein's veracity could have been impeached with evidence that he and Jeremy Chavis committed a

separate homicide in which he shot the victim seventeen times." *Id.* at PageID 8610. In other words, Petitioner believed that the Ozbolt Report was material for virtually the same reason he now argues that Summary 86 is material. Yet, despite being in possession of Summary 86, and despite knowing that materiality is assessed against the entirety of the evidence introduced by the State, Petitioner's only reference to the document is in a footnote stating that the document "will be the subject of Bethel's upcoming motion for leave to amend." *Id.* at PageID 8603 n.1. He did not use its contents as support for his arguments in the Objections. More importantly, he did not move at that point to stay and abey the proceedings at that point so that he could return to state court and present the Summary 86 evidence there.

On September 11, 2017, at least five months after coming into possession of Summary 86, Petitioner filed Objections to the Magistrate Judge's Supplemental Opinion Denying his Motion for Evidentiary Hearing (ECF No. 111). As with his initial Objections, Petitioner dedicated a substantial portion of the Supplemental Objections to his argument that, because Langbein was the key prosecution witness against him, the Ozbolt Report was crucial impeachment evidence that would have undermined his credibility and, thus, was material. *Id.* at PageID 8671-73. Moreover, Petitioner claimed, the Ozbolt Report had independent exculpatory value, as it supposedly contained an admission by Langbein "that he and Chavis killed the two victims in this case." *Id.* at PageID 8674. As with Summary 86 and the Motion to Stay, Petitioner cited affidavits from his trial counsel, both of whom averred that, had they known of the information contained in the Ozbolt Report, they would have used that information to question about both his involvement in the murders (exculpatory) and his motivation for testifying against Petitioner (impeachment). *Id.* at PageID 8675, citing Affs. of Richard Ketcham and Kirk McVay, ECF No. 55-7, PageID 4596, 4600; *see also id.* at PageID 8677-79 (citations omitted) (arguing that Langbein's recitation of the

crimes in the Ozbolt Report was much more consistent with objective evidence than that of Petitioner). Petitioner went so far as to term the consistency of Langbein's statements and the evidence introduced "corroborating facts" which, "along with the clear self-incriminatory nature of these remarks, renders the statements at issue . . . reliable." *Id*. at PageID 8679. Yet, Petitioner never refers to Summary 86 in his Supplemental Objections, despite his clear and ongoing belief that Summary 86 provides further corroboration to the statements. Nor did he move to stay the instant proceedings at that time so that he could return to the state court and exhaust the evidence contained in Summary 86.

It was only after Judge Barrett, on March 28, 2018, concluded that "what is missing in this case is the 'corroborating circumstances' which would indicate the trustworthiness of the statement[s]" in the Ozbolt Report (Opinion & Order, ECF No. 118, PageID 8726), that Petitioner filed the instant Motion to Stay. Even that motion was not filed until October 9, 2018, more than six months after Judge Barrett's order. Petitioner makes passing reference to Summary 86's being "newly discovered" (ECF No. 125, PageID 8870), and reiterates that he was barred from seeking such records until the Supreme Court of Ohio decided *State ex rel. Caster v. City of Columbus* on December 28, 2016. *Id*. at PageID 8873, citing 151 Ohio St. 3d 425, 2016-Ohio-8394. Yet, *Caster* does nothing to explain why he waited eighteen months after obtaining Summary 86 to file the instant Motion.

Petitioner argues that he has "sought to minimize any potential delay by filing his motion for leave in state court and requesting a hearing well before his motion to stay, let alone before any stay decision by this Court." (Objs., ECF No. 137, PageID 8985, citing Notice of State Court Litigation, ECF No. 124, PageID 8779). Yet, Petitioner concedes in that Notice that his "Motion for Leave to File a Delayed Motion for New Trial Based on Newly Discovered Evidence" and

"Motion for New Trial Based on Newly Discovered Evidence" were not filed in the Franklin County, Ohio, Court of Common Pleas until September 10, 2018 (ECF No. 124, PageID 8779). In his State Court Motion for Leave, Petitioner states that "he has recently discovered another police report—captioned 'Summary 86'—that is not only corroborating of his 2008 new trial motion, but it is also independently exculpatory." (ECF No. 124-1, PageID 8788). As with the motions filed in this Court, Petitioner focuses on his inability to obtain the records until *Caster* was decided. And as with the motions in this Court, Petitioner writes nothing about why he waited more than one year after discovering Summary 86 to move for relief in the state court.

Petitioner's argument that the prejudice to him from being executed due to the State's suppression of exculpatory evidence outweighs any prejudice to the State from allowing his return to state court (Supp. Objs., ECF No. 137, PageID 8984), is not persuasive. For one, as stated in the Supplemental Opinion (ECF No. 134, PageID 8953), the argument does not address "AEDPA's objective of encouraging finality[,]" an objective which "[s]taying a federal habeas petition frustrates[.]" *Rhines*, 544 U.S. at 277. Second, Petitioner has again failed to address what, if anything, prevented him from seeking relief in this Court or in the state court for more than one year after obtaining Summary 86. Absent such an explanation, Petitioner cannot be said to have been diligent in pursuing his claims (as opposed to diligence in obtaining *Brady* materials) or to have avoided undue delay. Thus, even assuming that the evidence that is the subject of the Motion to Stay relates back to Claim Fifteen in his Amended Petition, and thus, the statute of limitations in the ADEPA, 28 U.S.C. § 2244(d)(1), does not apply, Petitioner still has not shown that his claim is timely. Accordingly, the Motion to Stay is still not well-taken, and should be denied.

# CONCLUSION

For the foregoing reasons, Petitioner's Supplemental Objections (ECF No. 137) should be overruled.

May 20, 2019.

s/ *Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party=s objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).